UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WEBER MANUFACTURING
TECHNOLOGIES, INC.,

                    Plaintiff,                    No. 14-cv-12488

vs.                                               Hon. Gerald E. Rosen

PLASAN CARBON COMPOSITES, INC.,

                    Defendant.
_____/

MEMORANDUM OPINION AND ORDER
REGARDING MOTIONS *IN LIMINE*

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on August 1, 2016

PRESENT:  Honorable Gerald E. Rosen
                    United States District Judge

I.  INTRODUCTION

On July 18, 2016, the Court conducted a final pretrial/settlement conference in this breach of contract action.  In conformance with the Court's Scheduling Orders and in anticipation of trial, the parties filed a number of *in limine* motions.  Plaintiff Weber has filed ten motions *in limine* and Defendant Plasan has filed two such motions.  The Court discussed all of these motions with counsel for the parties at the July 18 pretrial conference and preliminarily ruled on most of them.  The Court now issues this

1

Memorandum Opinion and Order to memorialize those rulings.

1.    MOTIONS REGARDING SEQUENCE OF PROOFS

Weber has filed a Motion and Amended Motion *in Limine* to Set Order of Proofs [Dkt. # 71 & 75] and Plasan has countered with its own "Motion *in Limine* Regarding Sequence of Proofs at Trial" [Dkt. # 87].  In these motions, the parties ask the Court to set the order of proofs at trial.

The Court previously informally ruled on this issue when the parties appeared before the Court for a Status Conference in March 2016.  At that time, the Court indicated that it was inclined to go with Plasan's counsel's suggestion (to which Weber's counsel appeared receptive at the time):  that Weber open by putting on its proofs as to its breach of contract, account stated and unjust enrichment claims; Plasan then would put on proofs as to its defenses to Weber's case and put on its proofs as to its counterclaims for breach of warranty;  Weber then would put on its defense to Plasan's counterclaims, as well as its proofs as to its "declaratory judgment" claim of no breach of warranty. Weber's Complaint makes clear that it seeks a declaratory judgment to defeat Plasan's counterclaim allegations of breach of warranty:

> 46.    Weber's and Plasan's respective rights and obligations under the Contract and applicable law are in dispute.

> 47.    Specifically, Plasan alleges that the Contract contains product warranties which the Contract does not in fact contain, and Plasan alleges that applicable law provides Plasan with various "implied" warranties which applicable law does not in fact provide it.

48.    Moreover, to the extent any of the alleged warranties exist, Plasan voided any such warranties by its improper use and handling of the tools and molds, and Weber did not breach any such warranties.

[Amended Compl., ¶¶ 46-48.]

Although, as indicated, Weber appeared receptive to the proposed sequence, Weber now takes the position that, because it is the plaintiff, it should get to put on all of its proofs -- both as to its breach of contract/account stated claims AND its proofs of no breach of warranty first. And, since the Court did not issue any written ruling on the matter after the last Status Conference, it argues that the Court should re-think its stated position now. The Court declines to do so.

The district court has broad discretion in deciding orders of proof. *Anheuser-Busch, Inc. v. John Labatt Ltd.*, 89 F.3d 1339, 1344 (8th Cir. 1996); *see also  Martin v. Weaver*, 666 F.2d 10113, 1020 (6th Cir. 1981) ("As the 'governor of the trial for assuring its proper conduct,' the district court exercises broad powers to 'determine generally the order in which parties will adduce proof.'")

Weber's request that it put all of its claims and defenses on first would create more confusion than necessary for the jury. The Court's preliminary ruling follows a logical sequence and would make it easier for the jury to follow the proofs. Therefore, the Court adheres to its preliminary decision as to the order of proofs:  Weber will first put on its proofs as to its principal breach of contract/account stated/unjust enrichment claims; Plasan will then put on its affirmative defenses of defective goods/breach of warranty,

3

then Weber will then present its evidence concerning its claims of no defect and no breach of warranty. Accordingly, Plasan's Motion *in Limine* Regarding the Sequence of Proofs [Dkt. No. 87] will be GRANTED and Weber's Motion/Amended Motion *in Limine* to Set Order of Proofs [Dkt. Nos. 71 and 75] will be DENIED.

## 2. WEBER'S MOTION TO PREVENT INAPPROPRIATE ARGUMENTS BEFORE THE JURY [Dkt. No. 78]

Weber's Motion *in Limine* to Prevent Inappropriate Arguments Before the Jury will also be denied. The Court finds this motion itself to be wholly inappropriate.

Plaintiff bases this motion on defense counsel's conduct in an unrelated trial last year before the Honorable Gershwin Drain. (Weber's counsel was not even involved in that case.) Weber claims that in Judge Drain's case, Defense counsel "exhibited a pattern of arguing judicial rulings in front of the jury, making disrespectful comments toward the bench and opposing counsel and ignoring the Court's orders on evidentiary matters," and that Judge Drain held counsel in contempt. (Judge Drain later vacated his contempt order.)

The precise purpose of this motion escapes the Court. The Court has a breadth of experience presiding over complicated trials and managing difficult attorneys. It will certainly be able to govern the proceedings in this case and reign in any attorney misconduct without the need of a motion from participating counsel. Motions *in limine* are intended for evidentiary issues. To ensure "good conduct" by the attorneys is not such an issue. Therefore, Weber's Motion to Preclude Defendant's Inappropriate

4

Arguments Before the Jury [Dkt. # 78]will be DENIED.

3.     WEBER'S MOTIONS TO PRECLUDE INTRODUCTION OF WEBSITE
       TERMS & CONDITIONS AND TO PRECLUDE EVIDENCE IN SUPPORT OF
       ANY IMPLIED WARRANTIES  [Dkt. Nos. 69 and 80]

        Weber also has moved to preclude evidence of Plasan's website terms and

conditions.  Weber claims that the website terms and conditions are irrelevant and unduly

prejudicial because they were not incorporated into the parties contracts and the website

did not exist when Plasan first began ordering parts from Weber.

        There is no one written "contract" in this case; rather, like most automotive parts

suppliers, the parties' "contracts" are a series of purchase orders.  Some of Plasan's

purchase orders, after a certain date, rather than having Plasan's terms and conditions

printed on the reverse-side, referenced the company's website, and stated:  "Our Terms

and Conditions are found at: www.plasancarbon.com/home/ at "About us."

        As indicated above, "Weber's and Plasan's respective rights and obligations under

the Contract and applicable law are in dispute."  [Plaintiff's Amended Compl., ¶ 46.]

Therefore, it can hardly be said that Plasan's terms and conditions are irrelevant.  Quite

the contrary, the terms and conditions are relevant to the jury's determination of what the

terms of the contract were.

        More importantly, however, Weber's motion is nothing more than an untimely

disguised motion for summary judgment.  Weber's motion asks the Court to make a

finding that Plasan's terms and conditions are not part of the parties' contract and that

there is no question of fact that Weber did not assent to Plasan's terms and conditions. These are factual matters for the jury to decide; they are not proper subjects for a motion in *limine*.

"Where, as here, the motion *in limine* is no more than a rephrased summary judgment motion, the motion should not be considered." *Louzon v. Ford Motor Co.*, 718 F.3d 556, 563 (6th Cir. 2013). "[M]otions *in limine* should not be used to resolve factual disputes, which remains the function of a motion for summary judgment, with its accompanying and crucial procedural safeguards." *Williams v. Johnson* 747 F. Supp. 2d 10, 14 (D.D.C. 2010).

Courts in the Sixth Circuit have consistently denied litigants' attempts to seek the wholesale exclusion of claims or defenses. "[M]otions *in limine* are meant to deal with discrete evidentiary issues related to trial and are not [an] excuse to file dispositive motions disguised as motions *in limine." Dunn v. State Farm Mut. Auto. Ins. Co.*, 264 F.R.D. 266, 274 (E.D. Mich. 2009); *see also SPX Corp. v. Bartec USA*, 2008 WL 3850770 at *3 (E.D. Mich. Aug. 12, 2008) ("motions *in limine* are not proper procedural devices for the wholesale disposition of theories or defenses"); *ABC Beverage Corp. & Subsidiaries v. United States*, 2008 WL 5424174 at *2 (W.D. Mich. Dec. 4, 2008) (noting that motions *in limine* are not "substitutes for dispositive motions"); *Brown v. Oakland County*, 2015 WL 5317194 (E.D. Mich. Sept. 10, 2015) (same); *Goldman v. Healthcare Management Sys., Inc.* 559 F. Supp. 2d 853, 871 (W.D. Mich. 2008)

(collecting cases).  As the court in *Dunn* observed,

> The denial of a motion *in limine* is warranted where the moving party seeks
> to argue the merits of its case and preclude the non-moving party from
> presenting its case.

264 F.R.D. at 275 (citing *United States v. Karamuzis*, 2004 WL 2203413 (N.D. Ill. Sept.

30, 2004) (denying motions *in limine* to bar evidence related to equitable defenses and

prevent the non-moving party from arguing that *res judicata* and collateral estoppel apply

as improper motions for summary judgment).

In this case, the dispositive motion cut-off was April 30, 2015.  Weber never filed

any motion for summary judgment and it may not do so now under the guise of a motion

*in limine.*  Accordingly, Plaintiff's Motion *in Limine* to Preclude Defendant from

Introducing Its Website Terms and Conditions into Evidence [Dkt. No. 69] will be

DENIED.[1]

For the same reasons, Weber's Motion *in Limine* to preclude Plasan from

presenting evidence in support of any implied warranties of fitness or merchantability

also will be DENIED.  Weber claims that Plasan did not plead breach of any implied

warranty and "given the facts and applicable law, there is no relevant evidence as to

whether or not Weber's tools were merchantable."  Weber is mistaken that Plasan did not

plead breach of any implied warranty.  Plasan's counterclaim alleges, in addition to

---

[1]  To the extent that the reference to the website does not state "incorporated by reference herein" or other such buzz words of incorporation, whether or not the terms and conditions are part of the contract is a factual question for the jury to decide.

various express warranties that it claims Weber breached, that:

> 32.    Implied warranties also exist under applicable Michigan law as to the fitness, workmanship, and merchantability of the mold tools and tooling supplied by Weber.
>
> ***
>
> 36.    [T]he mold tools and tooling supplied by Weber to Plasan . . . were not manufactured based on Plasan's stated use or fit and sufficient for the purposes intended by Plasan.

Moreover, in Count II, ¶¶ 53-61 of Plasan's Counterclaim, Plasan expressly seeks

to recover for "Breach of Express *and Implied Warranties*." (Emphasis added). For these

reasons and for the reasons stated above with respect to Weber's motion to preclude

evidence of website terms and conditions, Plaintiff's Motion to *in Limine* to Preclude

Plasan from Introducing Evidence in Support of Any Implied Warranty of Fitness or

Merchantability [Dkt. # 80] will be DENIED.

## 4.    MOTION TO PRECLUDE DEFENDANT'S EVIDENCE OF TRADE PUFFING [Dkt. No. 72.]

Staying with website issues, Plaintiff's next Motion *in Limine* seeks to preclude

Defendant from presenting evidence of certain statements made by Weber on its website.

Plasan contends that website statements made by Weber constitute express warranties.

Specifically, Defendant intends to offer statements made by Weber that it delivers only

"World Class Tooling" for automotive suppliers and others, and that it had specialized

automotive tooling expertise such that it would deliver:

> •    "Excellence in Class 'A' body panels for hoods, deck lids, fenders, doors and quarter panels."

8

- "Tooling solutions for pickup truck boxes, fan shrouds, grille opening panels, rear end panels, lift gate panels, engine covers, oil pan covers and valve covers."

- "Full range of tooling for Automotive applications, both Interior & Exterior."

- "Tooling designed and built for either prototype or production runs."

- "Weber Manufacturing Technologies Inc. is committed to producing high quality tools that meet or exceed all customer requirements. Using dedicated project management from the early stages of conceptual tool design to the final delivery of the completed mold, we provide total customer satisfaction through every stage of the project."

- "We are committed to achieving total customer satisfaction in all aspects of our business and hold ourselves to the highest standards for superior quality, well-designed and constructed products, state of the art technology, on-time delivery, and world-class value."

- "Certified dimensional accuracy is critical on all of our projects. Every tool we supply is fully inspected, using one of our in-house CMM machines. All critical mold features are checked to customer supplied CAD part data. Comprehensive inspection reports are provided to satisfy a wide variety of customer specifications."

Having reviewed and examined these statements and the screen shots of Weber's website pages on which they appear, the Court agrees with Weber that most of these statements are nothing more than "trade puffing" which courts have precluded as irrelevant and/or unduly prejudicial. While the Court acknowledges that courts have held that catalog descriptions or advertisements may create an express warranty, *see e.g., Overstreet v. Norden Labs., Inc.*, 669 F.2d 1286, 1290 (6th Cir. 1982); *Kraft v. Dr. Leonard's Healthcare Corp.,*, 646 F. Supp. 2d 882, 890 (E.D. Mich. 2009),

9

("Advertisements and promotional literature may form 'a part of the basis of the bargain where they are prepared and furnished by the seller to induce purchase of its product and the buyer relies on the representations."); *Traxler v. PPG Indus., Inc.*, 2016 WL 320210 at * 6-7 (N.D. Ohio Jan. 27, 2016) (finding that representations on manufacturer's labels, advertisements and website amounted to express warranties, rather than mere advertising puffery where the representations were part of the basis of the bargain), the statements involved  in those cases were far more specific than the statements set forth above upon which Plasan relies.

Conversely, courts have held that generalized expressions of opinion and praise of a party's own products do not create an express warranty; rather they constitute nothing more than trade puffing.  *See e.g., Pidcock v. Ewing*, 435 F. Supp. 2d 657, 664 (E.D. Mich. 2006); *Yacht W., Ltd. v. Christensen Shipyards, Ltd.*, 2009 WL 1372954 at *5 (D. Or. May 14, 2009) (general representation that a product or company is "world class" constitutes trade puffing); *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 173-4, 835 N.E. 2d 801, 846-47,(2005) ("Describing a product as 'quality' or as having 'high performance criteria' are the types of subjective characterizations that ... [constitute] mere puffing."); *Breckenridge v. Cambridge Homes, Inc.*, 246 Ill. App. 3d 810, 823, 616 N.E. 2d 615, 623 (1993) (finding the terms "expert workmanship," "custom quality," and "perfect" to be trade puffing).

As evidence that the trade puffing nature of most of these statements did not

induce Plasan to enter into the specific contractual relationship at issue, the parties had a lengthy pre existing business relationship prior to their embarking on the specific production relationship presented here. Plasan was well familiar with Weber's capabilities, and it strains credulity that Plasan relied upon such generalized claims of quality on a website as a basis for entering into this particularly highly technical, cutting-edge production contract.

Having said this, there is one less generalized statement upon which Plasan claims to rely which may be sufficiently specific to pass muster here. i.e., the statement:

> "Certified dimensional accuracy is critical on all of our projects. Every tool we supply is fully inspected, using one of our in-house CMM machines. All critical mold features are checked to customer supplied CAD part data. Comprehensive inspection reports are provided to satisfy a wide variety of customer specifications."

Assuming Plasan is able to lay a foundational nexus between having read this statement, its relevance to this particular contract, and relying upon it in deciding to enter into the instant contractual relationship with Weber, this statement would be admissible. The remaining more general statements of opinion and praise for Weber's products appearing on Weber's website will not be allowed as evidence of any express warranties. Accordingly, Weber's Motion *in Limine* to Preclude Defendant from Introducing Evidence of Trade Puffing [Dkt. # 72] will be GRANTED.

5.   MOTION TO PRECLUDE DEFENDANT FROM INTRODUCING EVIDENCE OF KTX TOOLS [Dkt. No. 76].

During the pendency of this lawsuit, Plasan purchased replacement/substitute tools

from KTX.  Weber now moves to exclude evidence of the KTX tools claiming that evidence of the KTX tools is irrelevant.  Although Weber does not dispute that evidence of the KTX tools is relevant to Plasan's claim of damages, it argues that how the tools operated for Plasan is irrelevant.  The Court disagrees. Quite the contrary, the Court finds that evidence of the operation of the KTX tools may be very relevant, assuming a proper foundation, and should be allowed.  For example, evidence that there was no problem with the operation of the KTX tools may well be relevant to rebut Weber's contention that its tools failed due to the production environment at Plasan, again assuming a sufficient foundation, such as substantial similarity of conditions.  (Weber has argued that the failure of its tools is not attributable to poor design or workmanship, but rather that they failed due to the conditions of Plasan's production environment.)  The jury will be asked to determine why the Weber tools failed.  Therefore, the KTX tools are far from irrelevant.

Further, Weber's reliance on negligent design cases holding evidence of alternative designs irrelevant is misplaced.  In the negligent design context, courts have excluded evidence of alternative designs that only became available after the manufacture of the product in question. (*See* cases cited in Plaintiff's Reply Brief.)  However, in those cases, the alternative products were excluded because they were manufactured using technology not available at the time of the design of the disputed products.  *See e.g., Grenada Steel Indus., Inc. v. Alabama Oxygen Co., Inc.*, 695 F.2d 883, 889 (5th Cir.

1983) ("We fail to see how an alternative design, developed by another person years after the product in question was manufactured, is relevant to whether the product was reasonably safe at the time it was made."); *Stephan v. Marlin Firearms Co.*, 353 F.2d 819, 823 (2d Cir. 1965) (ruling that "a subsequent technological improvement... was not relevant... to the issue of prior negligent design.")  That is not the purpose of the use proposed by Plasan in this case.  Here, to rebut Weber's contention that the failure of its tools was due to Plasan's production environment, Plasan seeks to show that both the KTX tools and the Weber tools were operated in the same production environment, and the KTX tools functioned just fine.

For these reasons Weber's Motion *in Limine* to Preclude Defendant from Introducing Evidence of KTX Tools will be DENIED.

6.    MOTION TO PRECLUDE PLASAN FROM INTRODUCING TOOLING QUOTES NOT AT ISSUE [Dkt. No. 83.]

In this Motion, Weber seeks to prevent Plasan from presenting any evidence concerning any tooling quotes other than the Governing Quotes for the Corvette production tools for which Plasan claims Weber breached its warranties.  Weber claims that to allow Plasan to present evidence of anything other than the Governing Quotes will create undue prejudice to Weber and mislead the jury.

As noted, the relationship between Weber and Plasan long pre-dates Plasan's order of the 46 production tools giving rise to this action.  In 2007, Plasan first began requesting quotes from Weber for various pieces of automobile tooling, including tools to

13

be used for R&D purposes and early prototype tools, as well as production tools for then on-going Plasan supply programs, such as for the Ford Mustang.  Between 2007 and 2011, Weber issued numerous such quotes to Plasan.  Sometimes Plasan ordered the quoted tool from Weber and sometimes it did not.

Between 2011 and 2014, Plasan ordered 46 separate production tools from Weber to be used to make roofs, hoods, splitters and rockers for the Corvette Stingray.  Some of these tools were "hot oil" tools to be used in Plasan's new production process; some were traditional "autoclave" tools.  The "hot oil" tools are the products upon which Plasan bases its breach of warranty claims.  As is common practice in the automotive industry, each of the Corvette production tools was purchased by Plasan pursuant to a specific Plasan purchase order that was issued against a specific Weber quote number and "revision" level (a "Governing Quote").

The issue here centers around the maximum temperature limits of the production tools.  The production tools had a maximum temperature limit of 410°F whereas the R&D tools ordered by Plasan could run at 500°F to 600°F.  According to Weber, Plasan repeatedly tried to get witnesses to testify in their depositions that Weber production tools could run at 500°F to 600°F and believes that Plasan "is very likely to try this same sharp tactic again at trial" if the Court does not prevent it from doing so.  Weber believes that Plasan's goal is to place 500°F and 600°F language before the jury as much as possible and hope that the jury will be confused into thinking that these stated temperature limits

from the non-Governing Quotes constituted temperature warranties for the Corvette production tools.

Plasan states that it has no intent to attempt to "trick" the jury into thinking the R&D or prototype tooling quotations govern the production tooling at issue in this case. Rather, Plasan states that it wants to offer the prototype tooling quotations into evidence to demonstrate that the parties' relationship started years before the start of Corvette production program, and that the parties completed years of research, development and testing before launching the production program in order to rebut Weber's arguments that Plasan rushed into the Corvette production program without any R&D or testing, and that Weber thought the production tools were "experimental".

The Court finds that Plasan's stated limited purpose is a legitimate one. Further, any concerns regarding the distinction between temperature limits stated on a prototype tooling quote and a production tooling quote can be handled by a limiting instruction and readily addressed through cross-examination of the witnesses at trial. Accordingly, Weber's Motion to preclude Plasan from introducing tooling quotes not at issue [Dkt. # 83] will be DENIED.

7.    MOTION TO PRECLUDE PLASAN FROM PROFFERING EXPERT TESTIMONY IN THE GUISE OF LAY OPINION [Dkt. No. 79]

In this motion, Weber seeks a blanket order to preclude Plasan from permitting lay witnesses from offering their opinions as to what caused or did not cause Plasan to experience problems with Weber's tools, including opinions as to the "failure" or

15

"defect" in the tools; the quality and workmanship of the Weber tools and whether they met industry standards; and opinions concerning the new tools Plasan obtained from KTX. According to Weber, only a duly-qualified expert can offer such opinions. The witnesses with whom Weber is concerned in this motion are seven of Plasan's own employees, Plasan's tool repair vendor, Derek Starks, and two PhD metallurgists employed by Plasan's parent company, Plasan Sasa Ltd. in Israel. It appears that Weber's principal concern centers around the opinions of Plasan's tool repair vendor Derek Starks; James Staargaard, Plasan's CEO since 2010; Robert Murch, a Principal Engineer at Plasan; and Jim Ostrowski, a Senior Process Engineer at Plasan since 2004. According to Plasan, all of these witnesses have significant personal knowledge of, and experience with, the Weber tools at issue, the tests Plasan performed with them to try to get them to work as expected, Plasan's various efforts to repair and replace them, and Plasan's damages. They are fact witnesses but Plasan contends that the Court should permit opinion testimony from them because their opinions are based on the witnesses' substantial personal knowledge of the relevant facts and they will assist the jury in determining the facts.

Weber acknowledges FRE 701 permits lay witnesses to offer opinions based on the witnesses' own personal observations and work experience. However, because the work experiences of Plasan's proffered lay witnesses involve engineering, metallurgy, automotive production, automotive tool repair and other specialized experience, their

16

reasoning regarding the types of causation, quality and industry standards necessarily results from a process of reasoning which can be mastered only by specialists in those fields and could not be reached by an ordinary person.

Fed. R. Evid. 701 provides:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a)  rationally based on the witness's perception;

(b)  helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c)  *not based on scientific, technical or other specialized knowledge within the scope of Rule 702.*

Fed. R. Evid. 701 (emphasis added).

Subsection (c) of Rule 701 was added by the 2000 Amendments specifically "to eliminate the risk that the [expert] reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing. . . . [T]he amendment also ensures that a party will not evade the expert witness disclosure requirements sent forth in Fed. R. Civ. P. 26 ... by simply calling an expert witness in the guise of a lay witness."  Advisory Committee Note to 2000 Amendments.  As explained by the Sixth Circuit in *United States v. Kilpatrick*, 798 F.3d 365 (6th Cir. 2015), subsection (c) of Rule 701 is designed to "prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony."  *Id.* at 379.

17

In distinguishing proper lay testimony from expert testimony, the Sixth Circuit has specified that "lay testimony results from a process of reasoning familiar in everyday life, whereas an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field." *United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007). *See also Heritage Mut. Ins. Co. v. Reck*, 127 F. App'x 194, 199 (6th Cir. 2005) ("[A] person may testify as a lay witness ... if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person.")

Courts within the Sixth Circuit have repeatedly disallowed lay opinion testimony in circumstances similar to those the parties here anticipate will be presented. For example, in *City of Owensboro v. Kentucky Utilities Co.*, 2008 WL 4642262 (W.D. Ky. Oct. 14, 2008), the defendant utility company sought to call its own employees to testify regarding the cause of certain power outages and "derates" at a certain generating station, and to testify that the station was in good and workmanlike order and in accordance with industry standards. None of the employees had been disclosed as experts. Defendant argued that the witnesses' testimony was factual because it was based on the employees' "personal observations, perceptions and experiences ... in the course of their employment." 2008 WL 4642262 at *1. The court, however, held that the testimony did not constitute proper lay opinion under Rule 701, explaining:

> If KU's employees were to testify as to what they believed to be the cause of the outages and derates at ESGS and as to the industry standard, such testimony would require them to use "a process of reasoning which can be mastered only by specialists in the field." The cause of an outage at a coal-

fired plant cannot be determined with a process of reasoning familiar in everyday life. Similarly, the industry standard for coal-fired power plants is only known to those that are specialists in the field. KU argues that its employees would be testifying as lay witnesses because their opinions would be based on their "experience in the course of their employment duties." This however is one of the reasons why their testimony would be considered improper lay testimony. Similarly, using EFOR data to form an opinion as to whether OMU operated and maintained ESGS according to industry standards requires specialized knowledge within the scope of Rule 702.

2008 WL 4642262 at *2 (citations omitted).

The court similarly precluded such lay testimony in *Mills v. Riggsbee*, 2014 WL 1168726 (E.D. Ky. Mar. 21, 2014). In that case, a firefighter was injured during a sales demonstration for a firehose monitor when the hose came loose from the pumper truck and knocked him over. He claimed that the reason the hose came loose was because of a pressure build-up condition known as "water hammer," and that it was precipitated by the actions of Defendant Riggsbee who was conducting the demonstration. Mills sought to testify and to call his fellow firefighters who observed the incident to testify about water hammer and the cause of the demonstration mishap. However, Mills had not properly disclosed any of them as expert witnesses. He claimed that their testimony would constitute lay opinion because the firefighters would be testifying "based upon their everyday experience as firemen concerning their knowledge of water hammer and applying this knowledge their own personal observations." 2014 WL 1168726 at *6.

The court rejected plaintiff's argument:

[I]t simply cannot be said that the conclusion that water hammer occurred is

19

a result from a process of reasoning familiar in everyday life. "Water hammer" simply is not a concept that is common in everyday life. Indeed, it is doubtful that individuals without firefighting training or expansive experience with water hoses would be at all familiar with the concept. To the extent that any of these proposed witnesses concluded that water hammer occurred and that this water hammer caused the hose to come loose, this conclusion could have only been the result of their experience as firefighters. This is precisely the type of opinion testimony that is precluded by Rule 701. Accordingly, although these witnesses may testify as to the facts that each of them observed on the day of the accident, they may not offer their opinions as to whether water hammer occurred or as to whether water hammer caused the hose to separate from the fire truck. To permit otherwise would allow Plaintiffs to circumvent the requirements of the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

*Id.*

In *Frausto v. Cooper Tire & Rubber Co*., 2014 WL 3496767 (M.D. Tenn. July 10, 2014), the plaintiff sought to call a former employee of the defendant tire company who had worked in its manufacturing and design department, claiming the proposed witness was only a fact witness and would offer only lay opinion. The former employee was asked to review documents that had been produced to defendant, to define technical terms within those documents, and asked whether he agreed with statements read to him from various other documents that had been produced in discovery. The court found that the witness was being called to testify based on "scientific, technical, or other specialized knowledge." *Id.* at *3. Therefore, the court held that the testimony was not lay opinion, even though that scientific, technical or other specialized knowledge was developed in his career with the defendant. *Id.*

From the representations of counsel in their briefs and in the pretrial/settlement

20

conference, it appears that much of the testimony Plasan seeks to proffer as lay opinion in this case as to what caused or did not cause Plasan to experience problems with the Weber tools, including opinions as to whether the Weber tools breached express or implied warranties to Plasan, "failed," or were generally "defective," would be improper lay opinion. However, whether each witness's testimony is permissible lay opinion based on the witnesses' percipient responsibilities and what they actually observed, or whether it is actually expert opinion requiring compliance with the requisites of Rule 702 cannot be addressed in a vacuum or a "blanket" order in advance of trial. Rather, the Court will have to hear the testimony and rule on a case-by-case basis.

Therefore, the Court will deny Plaintiff's Motion to Preclude Plasan from Proffering Expert Testimony in the Guise of Lay Opinion [Dkt. # 79], without prejudice to Plaintiff's right raise this issue at trial if the testimony of any of Defendant's percipient witnesses slips into expert testimony covered by Rule 702.

8.   <u>MOTIONS TO STRIKE EXPERT WITNESSES [Dkt. Nos. 73, 86 and 88]</u>

The remaining motions deal with the parties' designated expert witnesses. Weber seeks to strike Plasan's two experts Robert Dealey and Mark Robinson. Plasan seeks to strike Weber's rebuttal expert, Dr. Lee Swanger.

<u>Robert Dealey</u>

Robert Dealey is Plasan's expert on liability issues. Plasan proffers him to testify regarding the fitness and suitability of the Weber molds in a high production

environment.  Weber moves to strike him as Plasan's expert because

> Dealey is neither an engineer nor a metallurgist, and he is not otherwise
> qualified to render the opinions he seeks to make in this case.  Dealey is a
> self-described expert on plastic injection molds, but the Weber tools are not
> plastic injection molds.

Weber further argues that even if Dealey is deemed qualified, his opinions do not

meet the reliability standards of FRE 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509

U.S. 579 (1993).

Plasan counters that in challenging Dealey's qualifications as an expert, Weber

ignores the training, knowledge and experience Dealey gained after over 40 years in the

field of designing and building mold tooling for manufacturing in the automotive and

other industries, and that Dealey's specialized knowledge regarding designing and

building molds for automotive manufacturing will help the jury.

As the Court indicated at the July 18 pretrial/settlement conference, a *Daubert*

hearing is needed before the Court can rule on Weber's motion to strike Robert Dealey as

Plasan's liability expert.  The Court has scheduled such a hearing for **Thursday,**

**September 8, 2016.**  Accordingly, the Court will defer ruling on Plaintiff's Motion to

Strike Robert Dealey [Dkt # 86] until after the *Daubert* hearing.

Mark Robinson

Weber also moves to strike Defendant's Proffered Expert Mark Robinson [Dkt.

#74].  Mark Robinson is an accountant and is Plasan's damages expert.  He is proffered

to quantify the economic damages allegedly suffered by Plasan.  Robinson has broken

22

down Plasan's damages into five categories.

Weber does not challenge Robinson's qualifications or his methodology; rather Weber argues that Robinson should be stricken as an expert, and his report found inadmissible as well, because his opinions with respect to all five damages categories "do not involve scientific, technical or other specialized knowledge and thus will not assist the jury to understand the evidence." According to Weber, Robinson "merely functions as a human calculator, performing basic arithmetic using figures supplied by Plasan," thus, his proposed testimony "addresses matters within the understanding or common knowledge of the average juror" and, accordingly, should be deemed inadmissible.

The Court disagrees. To the contrary, the Court finds that Mark Robinson is a straight-forward damages expert. And, since no issue was raised with respect to Robinson's qualifications or methodology, he will be permitted to testify as an expert to quantify Defendant's alleged damages. Accordingly, Weber's *Motion in Limine* to Strike Defendant's Proffered Expert Mark Robinson [Dkt. #74] will be DENIED.

<u>Dr. Lee Swanger</u>

The final pending *in limine* motion is Plasan's motion concerning Weber's proposed expert, Dr. Lee Swanger. [Dkt. # 88.] Plasan does not raise a *Daubert* challenge in its motion; rather Plasan argues that Dr. Swanger, who was only disclosed as a "rebuttal" expert, has proffered opinions exceeding the scope and subject matter identified in the report and testimony of Plasan's expert. Weber has stated that it intends

23

to use Dr. Swanger as an expert on Wahl temperature tags to rebut Plasan's affirmative defenses of product defect/breach of warranty. He is thus not strictly a "rebuttal" witness. The Court will conduct a *Daubert* hearing to determine the extent to which Dr. Swanger should be permitted to testify.   Accordingly, the Court will defer ruling on Plasan's Motion *in Limine* Concerning Weber's Proposed Rebuttal Expert, Dr. Lee Swanger, until after the September 8 *Daubert* hearing.

<u>CONCLUSION</u>

For the reasons stated above in this Opinion and Order and for the further reasons stated by the Court on July 18, 2016,

IT IS HEREBY ORDERED that Plasan Carbon Composite Inc.'s Motion *in Limine* Regarding the Sequence of Proofs **[Dkt. No. 87]** is **GRANTED** and Weber's Motion and Amended Motion *in Limine* to Set Order of Proofs **[Dkt. Nos. 71 and 75]** are **DENIED**.

IT IS FURTHER ORDERED that Plaintiff's Motion *in Limine* to Preclude Defendant's Inappropriate Arguments Before the Jury **[Dkt. # 78]** is **DENIED**.

IT IS FURTHER ORDERED that Plaintiff's Motion *in Limine* to Preclude Defendant from Introducing its Website Terms and Conditions into Evidence **[Dkt. No. 69]** is **DENIED**.

IT IS FURTHER ORDERED that Plaintiff's Motion *in Limine* to Preclude Plasan

24

from Introducing Evidence in Support of Any Implied Warranty of Fitness or Merchantability **[Dkt. No. 81]** is **DENIED**.

IT IS FURTHER ORDERED that Plaintiff's Motion *in Limine* to Preclude Defendant from Introducing Evidence of Trade Puffing **[Dkt. No. 72]** is **GRANTED**.

IT IS FURTHER ORDERED that Plaintiff's Motion *in Limine* to Preclude Defendant from Introducing Evidence of KTX Tools at Trial **[Dkt. No. 76]** is **DENIED**.

IT IS FURTHER ORDERED that Plaintiff's Motion *in Limine* to Preclude Defendant from Introducing Tooling Quotes Which Are Not at Issue **[Dkt. No. 83]** is **DENIED**.

IT IS FURTHER ORDERED that Plaintiff's Motion *in Limine* to Preclude Defendant from Proffering Expert Testimony in the Guise of Lay Opinion **[Dkt. No. 79]** is **DENIED, WITHOUT PREJUDICE.**

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike Defendant's Proffered Expert Mark Robinson **[Dkt. No. 73]** is **DENIED**.

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike Defendant's Proffered Expert Robert Dealey **[Dkt. No. 84]** and Defendant's Motion to Strike Plasan Carbon Composite, Inc.'s Motion *in Limine* Concerning Weber's Proposed Rebuttal Expert, Dr. Lee Swanger **[Dkt. No. 88]** are **TAKEN UNDER ADVISEMENT** pending

completion of a *Daubert* hearing, presently scheduled on **Thursday, September 8, 2016**

**at 10:00 a.m.**

      SO ORDERED.[*]

                  s/Gerald E. Rosen
                  United States District Judge

Dated:  August 1, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 1, 2016, by electronic and/or ordinary mail.

                  s/Julie Owens
                  Case Manager, (313) 234-5135

---

[*]  The parties should take care to note that a number of the Court's rulings herein are predicated upon the fulfillment of certain conditions, such as the establishment of a proper foundation, or potential limitations through jury instructions.  The parties are therefore reminded of their obligations under FRE 103(b) and 105.